IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHIRDENIA W., )
)
Plaintiff, )
)
v. ) 1:22CV450
)
KILOLO KIJAKAZI, )
Acting Commissioner of Social Security, )
)
Defendant. )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Shirdena W. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on February 19, 2020, alleging a disability onset date of August 8, 2019, later amended to allege an onset date of February 19, 2020, her application date. (Tr. at 10, 43-44, 209-18.)[1] Her application was denied initially (Tr. at 69-77, 88-91) and upon reconsideration (Tr. at 78-87, 98-107). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ").

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

(Tr. at. 108.) Plaintiff first appeared for a telephonic hearing on March 4, 2021. However, all parties agreed to postpone the hearing pending the submission of additional medical evidence. (Tr. at 10.) On August 19, 2021, Plaintiff, along with her attorney, attended the postponed telephonic hearing, at which both Plaintiff and a vocational expert testified. (Tr. at 10.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 20), and on April 20, 2022, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a

verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her application date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 13.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> osteoarthritis of the right hand, hypertension, and migraine headaches[.]

(Tr. at 13.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 14-15.) He therefore assessed Plaintiff's RFC and determined that she could perform medium work with the following limitations:

> [Plaintiff] can lift and carry 50 pounds occasionally and 25 pounds frequently; can sit, stand, and walk up to 6 hours each in an 8-hour workday; can frequently push, pull, handle, and finger with her dominant right upper extremity; and

5

would have approximately one unscheduled absence from work per month due to migraines.

(Tr. at 15.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff remained capable of performing her past relevant work as a home health aide. (Tr. at 19-20.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 20.)

Plaintiff now contends that the ALJ "erred by finding that Plaintiff only required one day of absences per month due to migraines." (Pl.'s Br. [Doc. #12] at 1.) Plaintiff contends that the ALJ should have instead adopted her contention that she suffers migraines once per month that last three days, requiring more than one day of absence per month. With respect to this contention, the ALJ's decision sets out Plaintiff's testimony, noting that during the August 19, 2021 telephonic hearing, Plaintiff testified that she experiences migraine headaches "about once a month, and it typically lasts about three days in duration." (Tr. at 15, 54-59.) The ALJ further noted that Plaintiff testified that "[s]he takes medications for her migraines and then stays in bed until it passes, even using a bedside commode and taking sponge baths so that she does not leave her bed." (Tr. at 15, 54-59.) However, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record, noting the "insufficient evidence of record," including the lack of "recorded signs and observations by medical treatment providers[] to corroborate and support" Plaintiff's contentions. (Tr. at 16.) The ALJ then set out at length his review of the evidence to support his conclusion that the evidence did not support symptoms of such severity, frequency, and duration as alleged by Plaintiff.

6

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p: <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, SSR 16-3p, 82 Fed. Reg. 49462, 49467, 2017 WL 5180304 (Oct. 25, 2017); see also 20 C.F.R. § 404.1529. In <u>Arakas v. Comm'r, Soc. Sec. Admin.</u>, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

<u>Arakas</u>, 983 F.3d at 95 (alteration in original). Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." <u>Craig</u>, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other

7

symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," id., as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;

(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;

(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, as instructed by the regulations, the ALJ considered the entire case record and explained the reasons for deviating from Plaintiff's statements regarding the impact of her migraines on her ability to work. Whether the ALJ could have reached a different conclusion based on the evidence is irrelevant. The sole issue before the Court is whether substantial evidence supports the ALJ's decision. See Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972) ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" (footnote omitted)).

Here, the ALJ reviewed the medical evidence, Plaintiff's testimony, and the record as a whole, and concluded that Plaintiff's migraines would cause "approximately one unscheduled absence from work per month." (Tr. at 15.) The ALJ noted the lack of supporting evidence in the medical record for Plaintiff's claims of disabling migraines, particularly the evidence reflecting that she sought minimal treatment for headaches and generally denied any headaches during almost every medical appointment over the period from February 2020 to the date of the hearing in August 2021. The ALJ specifically walked through each of these records, noting that Plaintiff first sought treatment on February 12, 2020, raising only complaints of right thumb pain. (Tr. at 16, 352.) That record reflects that Plaintiff told providers her right thumb pain was a "chronic (~6 months) problem" but she reported "no headaches" and on Review of Systems was "Negative for headaches." (Tr. at 353, 355.) The ALJ noted that five days later, on February 17, 2020, she again sought treatment just for her thumb pain (Tr. at 16, 367), and then did not seek medical care again for eight months, until October 11, 2020 when she reported to the emergency department complaining of knee pain. (Tr. at 16, 378.) She denied any other complaints and on Review of Systems was Negative for headaches. (Tr. at 379, 381.) Her blood pressure was elevated so she was started on antihypertensive medication. (Tr. at 16, 383.) However, as noted by the ALJ, she reported to the emergency department a few days later complaining of side effects from the antihypertensive medication, with "complaints of intermittent nausea, mild headache that had since resolved, hot flashes, muscle cramps, and decreased urination." (Tr. at 16, 387, 392, 395-97, 399.) According to the hospital record, she attributed the complaints to the antihypertensive medication and had begun to feel better after stopping the medication. (Tr. at 396-97, 399.) She reported that during the three

days she was on the antihypertensive medication, she had mild intermittent headaches that were gradual onset and resolved with Tylenol. (Tr. at 396.) As noted by the ALJ, her mild headache had since resolved, and she was diagnosed with possible dehydration and given intravenous hydration. (Tr. at 16-17, 396, 399-400.)[4]

The ALJ noted that Plaintiff began primary care with PA Mulligan about four months later, on February 8, 2021, and at that appointment only sought treatment for her right hand and reported hot flashes and night sweats. (Tr. at 17, 405.) That record also reflects that Plaintiff had hypertension but reported "no headaches," and on Review of Systems was "Negative for headaches." (Tr. at 405, 409.) She was started on amlodipine for hypertension. (Tr. at 17, 410.) The ALJ further noted that at a follow-up appointment on March 1, 2020, she continued to report hand pain but "reported no symptoms related to her hypertension, such as . . . headaches[] or dizziness." (Tr. at 17, 413.) That medical record reflects that Plaintiff reported "no headaches." (Tr. at 413.)

Plaintiff saw PA Mundy at Duke Orthopedics a few days later on March 5, 2021, for her right wrist and right knee. (Tr. at 17, 419.) At that visit she "also complained of having some persistent facial pain and headaches ever since a car accident as a teenager." (Tr. at 17.) The record reflects that Plaintiff reported that she was in a car accident when she was a

---

[4] This is consistent with Plaintiff's own initial allegations. In her disability application in February 2020, when directed to list all physical conditions that limited her ability to work, Plaintiff listed only arthritis in her right hand. (Tr. at 252.) In her April 1, 2020 summary regarding her disabilities, when asked to describe the Nature of Disability, Plaintiff listed only her right hand pain. (Tr. at 258.) In her May 8, 2020 Function Report, when asked how her illnesses or conditions limit her ability to work, Plaintiff listed only her inability to use her right hand. (Tr. at 270-77.) An updated report in July 2020 again referenced only right hand pain, and an update in September 2020 noted no new physical or mental conditions. (Tr. at 279, 290.) In October 2020, she provided an updated form noting hypertension and knee pain, and also noted dehydration and hot flashes as a result of taking blood pressure medication. (Tr. at 309, 314.) None of these reports from Plaintiff include any mention of headaches.

teenager and hit her right knee on the dashboard, and "[s]he does complain of some facial pain and headaches after the car accident many years ago." (Tr. at 419.) She was referred to the neurology department for further treatment and had an appointment three weeks later, on March 25, 2021, with NP Stepp. (Tr. at 17, 425). At that visit, Plaintiff reported knee and wrist pain as well as a "long history of migraines. Occurs at least 1 time per week." (Tr. at 425-26.) This is the first mention of migraines in Plaintiff's medical records. The record further reflects that Plaintiff reported a history of migraines, "[o]ccurring 1 time per month. Located in her right temporal region and can be behind her eye. Unsure of triggers. States the pain is a nerve sensation like shooting pain. Once symptoms start they can last for up to 3 days. Can cause associated light sensitivity and nausea." (Tr. at 426.) NP Stepp prescribed Maxalt to take at headache onset and also ordered an EMG of Plaintiff's right arm and leg. (Tr. at 426.) Notably, at a follow-up appointment with NP Stepp two months later on May 13, 2021, Plaintiff reported that she "had not experienced any headaches since the last appointment." (Tr. at 17, 434.) According to the medical record, Plaintiff reported that "she has not had any headaches." (Tr. at 434.)

Finally, Plaintiff returned to his primary care provider, PA Mulligan, on June 2, 2021, and as noted by the ALJ, Plaintiff reported that she had been "asymptomatic." (Tr. at 17, 439.) The medical record reflects that Plaintiff reported "no headaches." (Tr. at 439.) Plaintiff's EMG and nerve conduction study in June 2021 was determined to be a "normal study." (Tr. at 18, 445-47.)

In evaluating these records, the ALJ noted that Plaintiff "repeatedly denied experiencing any symptoms associated with her high blood pressure to her primary care

11

provider" (Tr. at 18), as reflected in the records showing, inter alia, no reported headaches. The ALJ further noted that "more recent treatment notes included a statement by the claimant denying her having any recent headaches over the past three months despite not filling her headache medication prescription" (Tr. at 18), as reflected in the record from NP Stepp. The ALJ noted that the "EMG and nerve conduction study showed no evidence of neuropathic abnormalities." (Tr. at 18.) The ALJ noted that further evaluation was warranted because Plaintiff was alleging symptomology in excess of what would be expected by the medical evidence. (Tr. at 18.) That further evaluation included her "prior work record, observations of treating physicians and other persons regarding the nature of [Plaintiff's] symptoms, the precipitating and aggravating factors, the use of medication and other treatment for relief of the symptoms, the functional restrictions, and [Plaintiff's] daily activities." (Tr. at 18.) Crucially, the ALJ noted that "the pivotal question is not whether [Plaintiff's] symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce [Plaintiff's RFC] as set out above or to preclude all work activity on a continuing and regular basis." (Tr. at 18.) The ALJ concluded that there was not sufficient evidence to support the degree of limitation alleged by Plaintiff, and specifically that the evidence did not support the allegations of symptoms of such severity, duration, or frequency as alleged. (Tr. at 18.)[5]

Because the record documents months during which Plaintiff experienced no headaches at all, and in fact reflects that Plaintiff denied any headaches during almost the entire relevant period, the ALJ reasonably discounted Plaintiff's assertion that migraine symptoms

---

[5] As noted by Defendant (Def.'s Br. [Doc. #13] at 7-8), this analysis is consistent with SSR 19-4p, which provides that "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." Social Security Ruling 19-4p: Titles II and XVI: Evaluating Cases Involving Primary Headache Disorders, SSR 19-4p, 84 Fed. Reg. 44667, 44671, 2019 WL 4169635 at *4 (Aug. 26, 2019).

Case 1:22-cv-00450-JEP   Document 15   Filed 09/25/23   Page 12 of 14

would cause her to miss three days of work per month. Instead, he concluded that Plaintiff would have "approximately one unscheduled absence from work per month due to migraines." (Tr. at 15.) The ALJ's inclusion of the word "approximately" clearly signals his recognition that the frequency of Plaintiff's migraines may vary, but based on the record as a whole the ALJ rejected Plaintiff's contention she would miss two or more days of work each month, precluding all competitive work at the unskilled or semiskilled levels. This is supported by the medical evidence discussed by the ALJ and noted above, reflecting that Plaintiff reported no headaches from February 2020 to March 2021, other than a single incident in October 2020 when she experienced a mild headache that was controlled with Tylenol and resolved when she was treated for dehydration. Plaintiff did report migraine headaches in March 2021, but then at the follow-up in May 2021 reported that she had not experienced any headaches, and in June 2021 again reported no headaches. Overall, the ALJ explained his reliance on the medical evidence in finding Plaintiff's migraines less limiting than she alleged, given Plaintiff's denial of symptoms to her primary care provider and denial of any recent headaches to PA Stepp (Tr. at 18), and substantial evidence therefore supports his RFC assessment and the decision as a whole.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] is DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #14] is GRANTED, and that this action is DISMISSED with prejudice.

This the 25th day of September, 2023.

/s/ Joi Elizabeth Peake
United States Magistrate Judge